AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
JUN 1 2 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

CX1 GPS Tracking Device
Black and Silver in Color - IMEI: 358899059532252

Case No. **19MJ2453**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, incorporated herein.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841, 846, 952, 960, and 963 | Distribution and Smuggling of a Controlled Substance and Conspiracy |

The application is based on these facts:
See Attached Affidavit of HSI SA Lisa Tracy

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Lisa Tracy, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: JUNE 12, 2019

*Judge's signature*

City and state: San Diego, CA     Hon. Andrew G. Schopler, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>**One CX1 GPS Tracking Device**<br>**Model Number: GT06N**<br>**IMEI: 358899059532252** | Case Number:<br>) AFFIDAVIT OF SPECIAL<br>) AGENT LISA TRACY<br>) IN SUPPORT OF SEARCH<br>) WARRANT<br>)<br>) |

## AFFIDAVIT

I, Lisa Tracy, Special Agent with the United States Department of Homeland Security, Homeland Security Investigations, having been duly sworn, depose and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant in furtherance of a narcotics smuggling investigation conducted by the Department of Homeland Security, Homeland Security Investigations for one CX1 GPS Tracking Device, Model Number: GT06N, IMEI: 358899059532252 ("**Subject Device**"), as described in Attachment A, to seize records and data from and including **November 1, 2018 to December 7, 2018** that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 21, United States Code Sections 841, 846, 952, 960, and 963, as described in Attachment B.

2. Customs and Border Protection Officers seized the Subject Device on December 7, 2018, from EDWIN GIOVANI AUGUSTINIANO ("AUGUSTINIANO"), at the Otay Mesa, CA Port of Entry. On that day,

1

AUGUSTINIANO was the driver and sole occupant of 2006 BMW 325i sedan. Upon inspection of the vehicle, Customs and Border Protection Officers ("CBPOs") discovered 60 packages of methamphetamine, totaling approximately 28.86 kilograms (63.63 pounds), concealed in an area behind the rear seat and under the rear deck of the vehicle. Also concealed within the vehicle, in the glove box, was the **Subject Device**. I believe it is likely that coconspirators used the **Subject Device** to locate and track the vehicle AUGUSTINIANO was driving during the drug smuggling event.

3.  Defendant has been charged with importation of a controlled substance (methamphetamine) in the Southern District of California (19cr0023-JLS). For the reasons discussed below, I respectfully submit that probable cause exists to believe that **Subject Device** likely contains evidence relating to violations of Title 21, United States Code Sections 841, 846, 952, 960, and 963. The **Subject Device** is currently in HSI possession at 880 Front Street, San Diego, CA 92101.

## EXPERIENCE & TRAINING

4.  I am a Special Agent for the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations (HSI). I have been employed as a special agent since March 1996 and am an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7). Previously, I was employed as a United States Border Patrol Agent in the San Diego Sector from November 1993 to March 1996. I am currently assigned to the Homeland Security Investigations, Deputy Special Agent in Charge (DSAC) San Ysidro Office, Contraband Smuggling Group 3. My current assignment is to investigate narcotics interdictions, and Drug Trafficking Organizations (DTO's) that import

illicit narcotics across the U.S./ Mexico international border and/or transport the smuggled narcotics to and/or through the Southern District of California. My professional experience working along the Southwest border and the training I have received as a Special Agent and Border Patrol Agent have familiarized me with the enforcement of laws relating to Immigration and Customs violations, including narcotics smuggling, the transportation of narcotics, and the laundering and movement of narcotics proceeds.

5. The facts and conclusions set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events, details, and circumstances described herein; and information gained through my training, experience, and communications with colleagues. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation. All dates, times, and amounts discussed herein are approximate.

## STATEMENT OF PROBABLE CAUSE

6. On December 7, 2018, at approximately 3:43 a.m., AUGUSTINIANO applied for admission into the United States from Mexico at the Otay Mesa, California Port-of-entry and gave two negative customs declarations. As mentioned, AUGUSTINIANO was the driver and sole occupant of a 2006 BMW 325i sedan bearing California license plate 5T0X485. The CBPO working at the primary booth noticed shiny new screws behind the vehicle seat, and a Human and

3

Narcotics Detector Dog screened the vehicle and alerted to a speaker wall in the trunk area of the vehicle. AUGUSTINIANO and the vehicle were then sent to secondary inspection for further inspection.

7. In secondary inspection, CBPOs ran the vehicle through the Z-portal, which showed anomalies between the rear passenger seats and trunk area. CBPOs searched the vehicle and found 60 packages under the rear deck area of the vehicle. A randomly selected package was field-tested, and it tested positive for methamphetamine. The packages collectively weighed approximately 28.86 kilograms (63.63 pounds). AUGUSTINIANO was arrested in violation of 21 U.S.C. § 952 & 960, Importation of Controlled Substances.

8. While conducting a search of the vehicle, CBPOs also seized the **Subject Device** from the vehicle's glove box. A visual inspection of the **Subject Device**'s exterior indicates that it is supported by the Mexican telecommunications company Telcel.

9. Post-arrest, AUGUSTINIANO acknowledged his rights and agreed to speak with law enforcement. He stated that he had driven the car containing the drugs from his home in Rosarito, Mexico to a McDonald's near the Otay Mesa Port of Entry every day for the last month in exchange for $500 a week and to keep the 2006 BMW. AUGUSTINIANO said that he had responded to a newspaper ad soliciting workers who could drive across the border. He called the phone number listed in the ad and met a man named "Jefe" (or "boss") in Rosarito. AUGUSTINIANO denied knowing Jefe's name and said that he was like an Uber driver; that he drove from Rosarito to the McDonald's parking lot, where he spent about three hours waiting for a phone call that would instruct him to pick up workers and transport them to nearby factories. AUGUSTINIANO did not know

which factories, though, and never picked up or transported anyone. He said that he saw other people get picked up in the parking lot, but did not appear to know or recognize those drivers. He did, however, recognize one other vehicle from "the company" that parked near McDonald's. That driver also never picked up any people.

10. AUGUSTINIANO received $500 a week, as well as the promise of keeping the BMW, as payment for driving to the McDonald's parking lot nearly every day for approximately a month.

11. AUGUSTINIANO said that he kept the BMW parked on the street near his home in Rosarito. He used it for personal business and to drive his family. When he drove to McDonald's, he stated that he stayed in the car. On one occasion, sometime before Thanksgiving, he was instructed to leave the BMW at a lot in the United States for his boss. His boss said he was going to cross on foot and pick up the vehicle. AUGUSTINIANO left the BMW in the United States and returned to Mexico on foot. In Mexico, the boss's son picked him up.

12. AUGUSTINIANO said that, from time to time, "they" would come to his house and take the BMW to get fixed. AUGUSTINIANO said, however, that the vehicle ran fine. The trunk did not open, but that was never fixed. AUGUSTINIANO said that his father told him not to drive the car, that he didn't know what might be in it, or what the people he was working for might do. AUGUSTINIANO acknowledged that he was suspicious that the car might contain something illegal, but said that he did not find anything illegal in the vehicle. He said that he did not ask if there was anything illegal because he was afraid that, if he found out there was something illegal, he could no longer keep the job, and he also thought he might be threatened.

13. AUGUSTINIANO's border crossing history indicates that he crossed in the BMW almost every day beginning on November 1, 2018, until his arrest on December 7, 2018. Prior to November 1, 2018, AUGUSTINIANO did not regularly cross in any vehicle into the United States from Mexico, and had only used pedestrian entry.

14. Based upon my experience, training, and consultation with other officers, I believe that AUGUSTINIANO, and other unidentified coconspirators, were involved in a conspiracy to import methamphetamine or some other prohibited narcotics and to distribute those prohibited narcotics within the United States. Based on my investigation of drug importation and distribution conspiracies, telephone contact with smugglers can begin months or weeks before drugs are loaded in the car and includes coordination on crossing the border to "burn plates" (develop a crossing history or pattern). AUGUSTINIANO's border crossing history is consistent with burning plates.

15. In this case, the presence of a tracker hidden inside the BMW driven by AUGUSTINIANO from Mexico to the U.S. border, coupled with the concealment of approximately 28.86 kilograms of methamphetamine inside the same car, is evidence that the user(s) of the tracker knew drugs were being smuggled from Mexico to the United States and used the tracker in furtherance of those illicit activities. The electronic contents of the tracker will therefore likely contain evidence of and pertaining to illegal drug trafficking activities. This evidence may include location information relating to where the drugs were loaded, as well as the route those drugs took to the U.S. border. There may also be identifying information relating to the subscriber(s) and user(s) of the tracking device, who likely know or are the same people who placed the drugs in the BMW.

16. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I am aware of the following:

    a. Drug smugglers will install a GPS tracking device in vehicles being used to transport large, and valuable, amounts of illegal cargo.

    b. Drug smugglers will use GPS tracking devices to target and actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug smugglers and their accomplices will use GPS tracking devices because they can easily determine what time their illegal cargo will arrive at predetermined locations.

    d. Drug smugglers will use GPS devices to ensure that drivers respond to an exact drop off and/or pick up time of their illegal cargo.

17. Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that GPS devices can and often do contain location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the GPS tracking device. Specifically, I know based upon my training, education, consultation with others, and experience investigating these conspiracies that searches of GPS tracking devices yields evidence:

    a. tending to identify attempts to import methamphetamine or some other controlled substance from Mexico into the United States;

      b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of methamphetamine or some other controlled substance from Mexico into the United States;

      c.    tending to identify co-conspirators, criminal associates, or others involved in smuggling methamphetamine or some other controlled substance from Mexico into the United States;

      d.    tending to identify travel to or presence at locations involved in the smuggling of methamphetamine or some other controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

      e.    tending to identify the user of, or persons with control over or access to, the GPS device; and/or

      f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

18.    Based on the facts and opinions set forth in this affidavit, I submit that there is probable cause to believe that information relevant to narcotics smuggling activities, such as location coordinates, travel routes, and subscriber information, will be found in the **Subject Device**.

## SEARCH METHODOLOGY

19.    It is not possible to determine, merely by knowing the GPS tracking device make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. GPS devices today can be simple cellular receiving devices. An increasing number of

GPS devices now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular devices do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular devices using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

20. Following the issuance of this warrant, I will collect the **Subject Device** and subject it to analysis. All forensic analysis of the data contained within the device and its memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant, as set forth in Attachment B.

21. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take several weeks. In this case, trial is set for July 8, 2019. To ensure that the **Subject Device**'s contents are reviewed and produced in discovery in a timely fashion, the personnel conducting

9

the identification and extraction of data will complete the analysis by **July 3, 2019**, absent further application to this court.

## CONCLUSION

22. Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachment B (incorporated herein) are likely to be found in the property to be searched described in Attachment A (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, a Special Agent with Homeland Security Investigations, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachment A, and seize the items listed in Attachment B.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Lisa Tracy
Special Agent, HSI

Subscribed and sworn to before me this 12th day of June, 2019.

Hon. Andrew G. Schopler
United States Magistrate Judge

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The property to be searched **(Subject Device)** in connection with an investigation of violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963, is described below:

 

CX1 GPS Tracking Device
Black and Silver in Color,

Model Number: GT06N, IMEI: 358899059532252

**Subject Device** is currently in the possession of the Homeland Security Investigations Evidence Custody Room, 880 Front Street, San Diego, CA 92101.

## ATTACHMENT B
### ITEMS TO BE SEIZED

Authorization to search the GPS tracking device described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular-enable device. The seizure and search of the GPS tracking device will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the GPS tracking device will be electronic records, communications, and data such as location data and subscriber or user information, for the period of November 1, 2018, to December 7, 2018:

    a.    tending to identify attempts to import methamphetamine or some other controlled substance from Mexico into the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of methamphetamine or some other controlled substance from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in smuggling methamphetamine or some other controlled substance from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the smuggling of methamphetamine or some other controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the subject GPS device; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963.**